UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CIVIL ACTION NO. 69-14428** |
| | ) | |
| **VERSUS** | ) | **JUDGE ROBERT G. JAMES** |
| | ) | |
| **WEST CARROLL PARISH SCHOOL BOARD,** *et al.* | ) | **MAG. JUDGE KAREN L. HAYES** |
| | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| | ) | |

**CONSENT ORDER**

This Consent Order arises out of the good faith efforts of Plaintiff United States of America (the "United States") and Defendant West Carroll Parish School Board (the "Board") to address and resolve the Board's school desegregation obligations in its operation of the West Carroll Parish Schools (the "District"). This Consent Order is jointly entered into by the United States and the Board, and the parties agree to comply with its terms. The Court, having reviewed the terms of this Consent Order, finds that it is consistent with the objectives of the Fourteenth Amendment to the United States Constitution and federal law. Thus, the Court orders, as follows.

I.     PROCEDURAL HISTORY

The procedural history of this case has been well-documented in prior orders and opinions;[1] thus, a brief recitation is sufficient. This school desegregation case was initiated by the United States on February 10, 1969. On August 1, 1969, the Court issued a decree approving a school desegregation plan proposed by the Board, which was designed to eliminate the *de jure* segregation and remove the vestiges of racial discrimination that remained after the dual school

---

[1] *See, e.g.*, February 14, 2007 Ruling [Doc. No. 28].

system was dismantled. The desegregation plan was subsequently modified by Orders issued in 1976 and 1991 to effectuate certain school consolidations and attendance zone changes. In 2001, the United States began an investigation of the District's inter-district student transfer policies and practices, which culminated with the entry of a Consent Order on March 14, 2007, and the approval of a new student assignment plan and corresponding student transfer requirements.[2]

The 2007 Consent Order anticipated that one or both parties would move for unitary status in the area of student assignment at the conclusion of the 2010-11 school year and that the parties would work together to resolve any outstanding concerns regarding the other facets of the District's operations, such as faculty assignments, staff assignments, transportation, facilities, and extracurricular activities.[3] Accordingly, during the 2010-11 school year, the United States initiated a comprehensive review of the Board's compliance with its obligations under the operative court orders and Federal laws, which included a review of the Board's annual court reports in this case, a review of the Board's responses to various requests for information, and a site visit of the District's schools in April 2011. In a Joint Status Report filed on July 5, 2011 (the "Status Report"), the parties reported on the results of the United States' unitary status review and identified those areas with which the United States had remaining concerns. Thereafter, the parties worked diligently to resolve the remaining concerns and negotiated the terms of this Consent Order as set forth below, which grants the District a declaration of partial unitary status and outlines the District's requirements for achieving full unitary status.

II.     **LEGAL STANDARDS**

The ultimate inquiry in determining whether a school district is unitary is whether the district has (1) fully and satisfactorily complied in good faith with the court's desegregation orders for a reasonable period of time; (2) eliminated the vestiges of prior *de jure* segregation to

---

[2] *See* March 21, 2007 Consent Order [Doc. No. 31].

[3] *See infra* at 6-8.

the extent practicable; and (3) demonstrated a good faith commitment to the whole of the Court's order and to those provisions of the law and the Constitution which were the predicate for judicial intervention in the first instance.[4] The "[p]roper resolution of any desegregation case turns on a careful assessment of its facts,"[5] and the Court must examine "every facet of school operations,"[6] including the policies and practices that relate to the *Green* factors, which include student assignment (both between and within schools); faculty assignment; staff assignments; transportation; facilities; and extracurricular activities, as well as other factors, such as quality of education[7] and student discipline .

The ultimate goal of the Court's analysis is to determine whether the District "has done all that it could to remedy the segregation caused by official action,"[8] and any current racial disparities in the District are presumed to be the result of its prior unlawful conduct unless the District demonstrates that the imbalances are not traceable in a proximate way to its former *de jure* system.[9]  Nevertheless, the Court may allow partial or incremental dismissal of the desegregation case before full compliance has been achieved in every area of school operations, thereby retaining jurisdiction over those areas not yet in full compliance and terminating jurisdiction over those areas in which compliance was found.[10]

---

[4] *See Missouri v. Jenkins*, 515 U.S. 70, 87-89 (1995); *Freeman v. Pitts*, 503 U.S. 467, 491-92, 498 (1992); *Board of Educ. v. Dowell*, 498 U.S. 237, 248-50 (1991).

[5] *Freeman*, 503 U.S. at 474.

[6] *Dowell*, 498 U.S. at 250 (quoting *Green v. County Sch. Bd.*, 391 U.S. 430, 438 (1968)).

[7] *See, e.g., Freeman*, 503 U.S. at 485, 494.

[8] *Anderson v. School Bd. of Madison Cnty.*, 517 F.3d 292, 298 (5th Cir. 2008).

[9] *See Freeman*, 503 U.S. at 494, *see also United States v. Fordice*, 505 U.S. 717, 739 (1992) (*Brown* and its progeny established that the burden of proof falls on the district to establish it has dismantled its prior de jure segregated system).

[10] *See Freeman*, 503 U.S. at 490-91.

III.  STIPULATED FACTS

A.  Student Assignment

The 2007 Consent Order approved a student assignment plan which revised five (5) geographic zones: Zone A (Kilbourne); Zone B (Oak Grove); Zone C (Goodwill/Forest); Zone D (Forest); and Zone E (Epps).  The 2007 Consent Order also approved changes to the District's residency verification and transfer policies, which were previously adopted pursuant to a 2003 Order.  During the 2011-12 school year, the Board operated six (6) schools in the five (5) geographic zones listed above and the District-wide student enrollment was 79% white, 18.6% African-American, and 2.4% other races.  As indicated in the District's annual report,[11] the 2011-12 school enrollment and grade structure are set forth in Table 1 below.

**Table 1:  Student Enrollment (2011-2012)**

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Epps High School | PK-12 | 124 | 36.3% | 216 | 63.2% | 2 | 0.6% | 342 |
| Forest High School | PK-12 | 43 | 9.0% | 418 | 87.4% | 17 | 3.6% | 478 |
| Goodwill Elementary | K-6 | 0 | 0.0% | 119 | 99.2% | 1 | 0.8% | 120 |
| Kilbourne High School | PK-12 | 57 | 16.5% | 287 | 82.9% | 2 | 0.6% | 346 |
| Oak Grove Elementary | PK-5 | 108 | 22.6% | 349 | 73.2% | 20 | 4.2% | 477 |
| Oak Grove High School | 6-12 | 75 | 17.6% | 340 | 79.8% | 11 | 2.6% | 426 |
| **Total Student Population by Race** | | 407 | 18.6% | 1729 | 79.0% | 53 | 2.4% | 2189 |

In Zone C, the Board operates Goodwill Elementary for students in grades K-8, and the students then matriculate to Forest High School in Zone D for grades 9-12.  In order to address financial concerns while also furthering the desegregation of the District's schools, the Board proposed, with the United States' consent, to close Goodwill Elementary and reassign the affected K-8 students to Forest High School; thus, eliminating Zone C.  This proposal is discussed in greater detail below.

In conjunction with its review of student assignment in the District, the United States undertook an analysis of the District's student disciplinary policies and data for the 2009-10

---

[11] *See* December 15, 2011 Annual Report [Doc. No. 54].

4

school year, which revealed discernible patterns of racial disparities. First, the percentage of African-American students who were disciplined often exceeded, and in several instances far exceeded, the African-American percentage of enrollment at the schools, while the percentage of white students who were disciplined was often lower than the white percentage of enrollment. For example, 78.9% of the students who received detention at Oak Grove Elementary School were African-American despite the fact that African-American students comprised only 21.2% of the enrollment at the school. Also, these disparities remained when controlling for students who were disciplined more than once. Second, racial disparities exist with respect to the types of discipline students received. For example, at Oak Grove High School, 24.2% of the African-American students disciplined received out-of-school suspensions while only 15.7% of the white students disciplined received out-of-school suspension. By contrast, white students were more likely to be disciplined through in-class detention – which did not remove them from class – than African-American students.

Third, the District's records revealed disparities with respect to the categories of offenses that triggered disciplinary action. Specifically, the data showed that African-American students were disciplined more often for more subjective categories of offenses, such as disrespect, disruption, and inappropriate language, as opposed to objective offenses, such as tardiness or fighting. For example, 20.7% of the African-American students who received detention at one school were disciplined for disrespect. By contrast, only 13.1% of the white students received detention for the same offense. Similarly, when controlling for any repeat offenders, the percentage of African-American students who were suspended for disrespect deviated by 60.3% from the overall African-American enrollment. In fact, half of the African-American students who were suspended were disciplined for disrespect (29.6%), disruption (3.7%), and inappropriate language (11.1%). By contrast, only 6.7% of the white students were suspended were disciplined for such subjective offenses. Finally, there were racial disparities with the

5

administering of corporal punishment.

To address these disparities, the United States proposed and the Board consented to retain the Intercultural Developmental Research Association/Southern Central Collaborative for Equity (IDRA/SCCE) to provide technical assistance and training and to revise its student discipline policies. This proposal is discussed in greater detail below.

B.   **Faculty Assignment and Staff Assignment**

As of the 2011-2012 school year, the Board employs 160 teachers, of whom 96.2 percent are white, 3.8 percent are African-American, and less than one percent are another race. The 2011-2012 faculty assignments were, as follows:

**Table 2: Faculty Assignment (2011-2012)**

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
| Epps High School | PK-12 | 2 | 7.7% | 24 | 92.3 | 0 | 0.0% | 26 |
| Forest High School | PK-12 | 2 | 5.4% | 35 | 94.6% | 0 | 0.0% | 37 |
| Goodwill Elementary | K-6 | 0 | 0.0% | 10 | 100% | 0 | 0.0% | 10 |
| Kilbourne High School | PK-12 | 1 | 3.7% | 25 | 92.5% | 1 | 3.7% | 27 |
| Oak Grove Elementary | PK-5 | 0 | 0.0% | 33 | 100% | 0 | 0.0% | 33 |
| Oak Grove High School | 6-12 | 1 | 3.5% | 27 | 96.4% | 0 | 0.0% | 28 |
| **Total Faculty Assignment by Race** | | **6** | **3.8%** | **154** | **96.2%** | **1** | **<0.0%** | **160** |

Records indicate that although the District has a largely white faculty and staff, it has exhibited a sustained good faith effort to recruit minority teacher and administrators so as to remedy the effects of any past discriminatory practices.[12] For example, each of the District's vacancies for teacher positions between 2007 and 2010 were announced/advertised on the Teach Louisiana website and in the West Carroll Gazette, and the District took affirmative steps to send each of the advertisements to regional universities, including the Historically Black Colleges and Universities, such as Grambling State University and Alcorn State University. The District also offers tuition reimbursement to teachers who pursue training to become certified administrators.

With respect to faculty assignment, it appears that the District's six African-American

---

[12] *Fort Bend Indep. Sch. Dist. v. City of Stafford*, 651 F.2d 1133, 1140 (5th Cir. 1981).

teachers are assigned to schools in a non-discriminatory manner. There is also no evidence of discrimination with respect to the assignment of staff who work directly with students.

Based on this record, it appears that in the areas of faculty and staff assignment the Board has eliminated the vestiges of segregation to the extent practicable, has complied with its desegregation obligations for a reasonable period of time, has demonstrated a good faith commitment to the whole of the Court's orders, and is, therefore, entitled to a declaration of partial unitary status.

### C.   Transportation

The District provides transportation to all eligible students enrolled in the District on a non-discriminatory basis. It appears that in the area of transportation the Board has eliminated the vestiges of segregation to the extent practicable, has complied with its desegregation obligations for a reasonable period of time, has demonstrated a good faith commitment to the whole of the Court's orders, and is, therefore, entitled to a declaration of partial unitary status.

### D.   Extracurricular Activities

The District provides all students an opportunity to participate in extracurricular activities on a non-discriminatory basis. It appears that in the area of extracurricular activities the Board has eliminated the vestiges of segregation to the extent practicable, has complied with its desegregation obligations for a reasonable period of time, has demonstrated a good faith commitment to the whole of the Court's orders, and is, therefore, entitled to a declaration of partial unitary status.

### E.   Facilities

The District operates six school facilities that are comparable in terms of their structure and utility and provides academic resources, such as computers and other technologies, to students on a non-discriminatory basis. It appears that in the area of facilities the Board has eliminated the vestiges of segregation to the extent practicable, has complied with its

7

desegregation obligations for a reasonable period of time, has demonstrated a good faith commitment to the whole of the Court's orders, and is, therefore, entitled to a declaration of partial unitary status.

## IV.   STIPULATED REMEDIAL MEASURES

The sole remaining issues identified by the United States regarding the Board's operations of its schools relate to the factor of student assignment, and more specifically: (1) the operation of Goodwill Elementary as a racially identifiable school; and (2) the administering of student discipline in a manner that results in racial disparities.[13]  Although the Board does not admit or agree that these issues exist or that they should prevent the Board from being declared unitary in the area of student assignment, it has agreed to take certain good faith, practicable steps to address these outstanding issues during the 2012-13 school year.  The parties agree and the Court finds that once such actions, which are set forth below, are fully implemented the District will have remedied the remaining student assignment issues and will be entitled to a declaration of full unitary status after the conclusion of the monitoring/reporting period as detailed below.

### A.   Goodwill Elementary

The Board has approved and agrees to immediately close Goodwill Elementary and reassign all affected students to Forest High School effective at the beginning of the 2012-13 school year.  This action will eliminate the racially identifiable Goodwill school.  The projected enrollments of the schools for the forthcoming school year, following the closure of Goodwill, are set forth in Table 3 below.

---

[13] The July 5, 2011 Joint Status Report noted that the United States also observed racial disparities in the District's gifted and talented program, as well as the enrollments in the Advanced Placement classes and the District's community college dual enrollment program. The United States recommended certain remedial efforts, such as increased use of website notices and other media to ensure that information concerning these programs was broadly disseminated to students and parents, and the District subsequently adopted these recommendations.

**Table 3: Projected Student Enrollment (2012-2013)**

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Epps High School | PK-12 | 128 | 37.1% | 217 | 62.9% | 0 | 0.0% | 345 |
| Forest High School | PK-12 | 38 | 6.6% | 520 | 90.6% | 16 | 2.8% | 574 |
| Kilbourne High School | PK-12 | 64 | 16.7% | 316 | 82.3% | 4 | 1.0% | 384 |
| Oak Grove Elementary | PK-5 | 98 | 21.6% | 338 | 74.4% | 18 | 4.0% | 454 |
| Oak Grove High School | 6-12 | 81 | 17.7% | 362 | 79.0% | 15 | 3.3% | 458 |
| **Total Student Population by Race** | | **408** | **18.4%** | **1753** | **79.1%** | **53** | **2.4%** | **2215** |

Based on these projections, the enrollment at each of the schools, including Epps High School, will be within +/-20 percentage points from the district-wide enrollments. Moreover, the District has renovated Forest High School to add seven additional classrooms since 2007; thus, the proposed changes to the student attendance zones will not cause the enrollment at any of the school to exceed its capacity.

The Board shall submit proof that Goodwill has been closed and students reassigned to Forest High School by filing with the Court by no later than October 15, 2012, a report stating the total number and percentage of students, by race/ethnicity and grade level, assigned to each school operated by the District. The United States and the Board agree that, upon successful implementation of this closure and the reassignment of the students as set forth above, the Board will have taken sufficient steps to resolve the issue of student assignment between District schools.

B.  **Student Discipline**

The Board has undertaken and agrees to take several remedial actions in a good faith effort to address the continued racial disparities in student discipline. First, the Board retained IDRA/SCCE to provide technical assistance and training on accepted best practices related to student discipline, effective classroom management skills, and the State-mandated Positive

Behavior Intervention and Support (PBIS) program.[14] IDRA/SCCE provided six hours of training to central-level and school-level administrators on May 22, 2012, and shall provide six hours of training to all teachers and staff who are responsible for student discipline by no later than the end of 2012. The Board shall submit proof that all teachers and school-level administrators and relevant staff have attended the training described above by sending to the United States by no later than January 15, 2013, a list of all employees who received the training, along with their titles, the school to which they are assigned, and the date of the training they attended, along with a declaration signed by the District's Superintendant affirming the accuracy of the list.

      Second, with IDRA/SCCE's assistance, the Board shall conduct a comprehensive analysis of its discipline policies, procedures, and data, and shall then adopt a single revised discipline policy or Code of Conduct that provides teachers, school-level administrators, and relevant central office staff detailed guidance related to discipline, including clear and precise definitions of prohibitive conduct; objective criteria for determining violations/infractions; and explicit instructions for determining disciplinary actions, including the factors to be considered in devising the appropriate punishment (*e.g.*, prior misbehavior, prior PBIS intervention efforts). The Board shall adopt and implement its revised policy as soon as practicable, and by no later than the start of the spring semester of the 2012-13 school year.

      The Board shall provide a copy of its proposed policy to the United States for review and consideration by no later than January 15, 2013; and if the United States does not object to the

---

[14] In 2003, the State passed the Juvenile Justice Reform Act 1225, which directed the Board of Elementary & Secondary Education to "formulate, develop and recommend a model master plan for improving behavior and discipline within schools" that includes "positive behavioral supports and other effective disciplinary tools." R.S. 17:252, et seq. The law also requires each parish school board to develop master discipline plans for each school and to "make provision for pre-service and ongoing grade appropriate classroom management training for teachers, principals, and other appropriate school personnel regarding positive behavioral supports and reinforcement, conflict resolution, mediation, cultural competence, restorative practices, guidance and discipline, and adolescent development." *Id*.

proposed policy within twenty (20) business days after receipt, any objections to the content and sufficiency of the policy shall be waived and the Board shall adopt and immediately implement the revised policy and thereafter promptly submit proof of implementation to the United States.

Third, the Board shall ensure that all District employees responsible for classroom management and student discipline, including all teachers, school-level administrators, and relevant central office staff receive a minimum of three hours of training each year on the District's discipline policy and procedures to ensure they are familiar with the policy and understand how to consistently apply it in practice. The first series of annual training on the new policy must be completed within thirty (30) school days after the United States either does not object to or consents to the Board's new policy. The Board shall submit proof that all teachers and school-level administrators and relevant staff have attended the training described above by sending to the United States by no later than fourteen (14) days after the final training session is completed a list of all of the people who received the training, along with their titles, the school to which they are assigned, and the date of the training they attended, along with a declaration signed by the District's Superintendant affirming the accuracy of the list.

Fourth, the Board shall adopt and implement a process for monitoring student discipline data at both the school and District level, including reviews of in-class disciplinary actions, referrals for disciplinary actions, individual discipline infractions, and corresponding punishments including all conferences, detentions, in-school and out-of-school suspensions, corporal punishments, and expulsions, to regularly determine and address the presence of any racial disparities.

    **C.**    **Prior Reporting Requirements Superceded.**

The reporting requirements outlined above shall supercede and replace all other reporting requirements ordered by the Court.

    **D.**    **Modifications.**

For any modifications to any of the terms of this Consent Order related to closure of Goodwill and/or the revised discipline policy, the Board must seek the approval of the Court through an appropriate motion, which may be filed with or without consent of the United States.

**V.**    **FINAL TERMINATION**

Having found that the Board has satisfied its desegregation obligations in the areas of faculty assignment, staff assignment, transportation, extracurricular activities, and facilities in the operation of the District's schools, the Court hereby declares the West Carroll Parish School System unitary in those areas and dismisses the permanent injunction as to those issues and withdraws its jurisdiction over those areas of operation of the District's schools.

Continued judicial supervision of the Board in its operations of the District's schools will be limited to ensuring compliance with the terms set forth above regarding the closure of Goodwill Elementary and the adoption and implementation of a revised student discipline policies and related trainings. The United States and the Board have committed to negotiate in good faith any disputes that may arise with regard to such issues, but either party shall have the right to seek judicial resolution of any issue related to compliance with this Consent Order.

The Board retains the burden of eliminating any vestiges of *de jure* segregation which may continue to exist in the area still under this Court's supervision. The parties have agreed and the Court finds that the Board will have met its desegregation obligations in the remaining areas of operation if it implements the Goodwill closure and student discipline provisions of this Consent Order, both as set forth above. Therefore, upon demonstration of successful implementation of such provisions, but no sooner than two semesters after the District adopts and fully implements the new student discipline policy, the Board may move for a declaration of unitary status and final dismissal as to the remaining issue.

**SO ORDERED, ADJUDGED AND DECREED**, this 16th day of August, 2012.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE